## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 07 2017, 6:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Gordon A. Etzler | Cassandra Hine |
| Valparaiso, Indiana | San Pierre, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ross Nifong d/b/a Ross Nifong Farms and Ross Nifong Farms, LLC, | June 7, 2017 |
| *Appellant-Defendant,* | Court of Appeals Case No. 50A04-1609-CC-2288 |
| v. | Appeal from the Marshall Circuit Court |
| Joseph R. Brown d/b/a Joe Brown Drilling Contractor, | The Honorable David P. Matsey, Special Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 50C01-1307-CC-211 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Ross Nifong, d/b/a/ Ross Nifong Farms and Ross Nifong Farms, LLC (Nifong), appeals the trial court's judgment, awarding Appellee-Plaintiff, Joseph R. Brown, d/b/a/ Joe Brown Drilling Contractor (Brown), the sum of $36,055.74 on Brown's breach of contract claim.

We affirm.

# ISSUES

Nifong presents this court with four issues on appeal, which and restate as follows:

> (1) Whether a condition precedent existed to the verbal contract between Nifong and Brown;
>
> (2) Whether Brown trespassed on Nifong's property;
>
> (3) Whether the trial court properly denied Nifong's claim for criminal conversion; and
>
> (4) Whether the trial court abused its discretion when it awarded Brown $36,055.74 based on *quantum meriut* or on account stated.

# FACTS AND PROCEDURAL HISTORY

In late May of 2011, Brown was contacted by Chad Nifong (Chad), to drill an agricultural well on a 290-acre parcel of land located at 18501 7th Road, in Plymouth, Indiana (Property), which was owned by Nifong. Chad cash leased the Property on a yearly basis from Nifong pursuant to a written lease. For the

past fifty-five years, Brown has been a well drilling contractor in Knox, Indiana. His work consists of drilling agricultural wells and installing pumps thereon to supply water to a crop's irrigation system.

[5] During an initial conversation, Chad indicated to Brown that he required a new well because the current well on the Property was not providing enough water for the potato crop he had recently planted. When Brown arrived at the Property with his drilling rig and crew in mid-June, 2011, Chad mentioned to him that "he had to have water for potatoes, or he was gonna [sic] lose em [sic]" and indicated that "he would like to have 800 gallon per minute." (Transcript p. 24). Brown responded that he would try. In fact, Brown "never" made any guarantees to get a specific gallon per minute flow as it would "be pretty silly to do that." (Tr. p. 38).

[6] Prior to beginning work, Brown had run a test well, which indicated the existence of "a 1,000 gallon a minute well." (Tr. p. 108). When drilling the first well, the screen blew and Brown had to move the drilling site and start another well. Approximately ten days after the new well and pump were operational, Brown performed an engineer-approved flow rate test. Initially, the test indicated a production of 825 gallons of water per minute which, after 7 to 8 hours, tapered off to 775 gallons of water per minute. After receiving the results of the test, Chad called Brown and expressed his satisfaction. When Brown handed Chad the invoice for the work performed, Chad instructed him to send the bill to Nifong. Shortly after Brown sought payment from Nifong, Nifong provided Brown with an invoice for $10,000 from a third party, well

driller Jim Ousley (Ousley), and advised Brown to collect payment from Ousley who had drilled a well on the Property in 2010, which had never worked properly.

[7] In June and December of 2011, Irrigation Solutions was contacted to flow test Brown's well. Using a mechanical style flow meter, the test showed the well to yield 600 gallons of water per minute. A second test performed in December, established that the flow had further decreased to 500 gallons of water per minute.

[8] On July 16, 2013, Brown filed a Complaint against Nifong for breach of contract and *quantum meruit*. By September 13, 2014, after more than three years of not being paid for his work and equipment, Brown instructed his employees to remove his pump from the Property. However, in removing Brown's pump, the employees also removed the gearhead from the pump, which had been previously installed by Ousley. On November 14, 2014, Nifong filed an Application for and Order to Restore Wells and Preserve Evidence regarding the equipment taken by Brown's employees. On December 12, 2014, the trial court ordered Brown to return "all equipment not belonging to [Brown] which was mistakenly removed from [Nifong's] [P]roperty." (Appellant's App. Vol. II, p. 75). In addition, Brown was ordered to "secure and preserve in the present condition all other well equipment" removed from the Property. (Appellant's App. Vol. II, p. 75). On April 20, 2015, Nifong filed a motion to show cause for contempt of court, alleging that while Brown had returned some of the well equipment, he had not returned the Ousley well to

working condition. On April 27, 2015, the trial court entered a citation for rule to show cause and set the matter for a hearing. On October 8, 2015, the trial court conducted a bench trial. After the parties were granted time to file their proposed findings of fact and conclusions thereon, the trial court awarded judgment to Brown in the amount of $36,055.74 on August 31, 2016.

[9] Nifong now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[10] The trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A) at the request of the parties. When a party requests findings of fact, we apply a two-step review. *Brazier v. Maple Lane Apartments I, LLC*, 45 N.E.3d 442, 454 (Ind. Ct. App. 2015), *trans. denied*. First, we consider whether the evidence supports the findings, and second, whether the findings support the judgment. *Id*. We do not reweigh the evidence or assess witness credibility, and we consider only the evidence most favorable to the judgment. *Id*. We will set aside the trial court's findings and conclusions thereon if they are clearly erroneous; that is, if the record contains no facts or inferences supporting them. *Id*.

## II. *Condition Precedent*

[11] We note that the parties do not dispute that Brown never had an express written contract with Nifong for any of the work he completed on the Property; rather,

he performed the work as orally agreed upon between himself and Chad, acting on behalf of Nifong. Thus, while neither party challenges the existence of a verbal contract, they do differ on the contract's terms. Specifically, Nifong contends a condition precedent attached to the contract, by which Brown had committed to deliver a well with a flow of 800 gallons of water per minute prior to being paid for his work.

[12] The existence of a contract is a question of law. *Morris v. Crain*, 969 N.E.2d 119, 123 (Ind. Ct. App. 2012). The basic requirements of a contract are offer, acceptance, consideration, and a meeting of the minds of the contracting parties. *Id*. "For an oral contract to exist, parties have to agree to all terms of the contract." *Kelly v. Levandoski*, 825 N.E.2d 850, 857 (Ind. Ct. App. 2005), *trans. denied*. If a party cannot demonstrate agreement on one essential term of the contract, then there is no mutual assent and no contract is formed. *Id*. The essential elements of a breach of contract claim are the existence of a contract, the defendant's breach, and damages to the plaintiff as a result. *Brazier*, 45 N.E.3d at 455.

[13] A party breaches a contract when he fails to perform all the obligations which he has agreed to undertake. *Worrell v. WLT Corp.*, 653 N.E.2d 1054, 1057 (Ind. Ct. App. 1995), *trans. denied*. Under contract law, a condition precedent is a condition that must be performed before the agreement of the parties becomes a binding contract or that must be fulfilled before the duty to perform a specific obligation arises. *Aquasource, Inc. v. Wind Dance Farm, Inc.*, 833 N.E.2d 535, 539 (Ind. Ct. App. 2005), *reh'g denied*. Indiana courts have consistently recognized

that an express condition must be fulfilled or no liability can arise on the promise that the condition qualifies. *McGraw v. Marchioli*, 812 N.E.2d 1154, 1157 (Ind. Ct. App. 2004).

[14] In its conclusions, the trial court decided that "[t]here was insufficient evidence to establish any condition precedent to [Nifong's] payment of said sum to [Brown]." (Appellant's App. Vol. II, p. 133). In reaching this conclusion, the trial court formulated the following findings:

> 23. Thereafter, Chad contacted [Brown] in April or May, 2011, about drilling a well and installing a pump upon the parcel. [Brown] told Chad during those initial discussions that he could provide a well and pump that would provide Chad with 700 gpm [or gallons per minute]. []
>
> 24. [Brown] drilled the well and installed the pump on or about June 17, 2011. Around that time, [Brown] performed an engineer-approved flow rate test over approximately twenty-four (24) hours. At the beginning of the test, the well/pump supplied 825 gpm and after twenty-four (24) hours, the flow rate was 775 gpm.
>
> * * * *
>
> 27. [Brown] has never been paid any money from [Nifong] or [Chad] for the invoiced goods or services. [Brown] testified that not once did Chad or [Nifong] ever complain to him about the well or pump or ever objected to the amount stated on [Brown's] July 2011 invoice until after [Brown] filed the instant suit.
>
> 28. There was conflicting testimony about [Chad] and [Brown's] conversations after [Brown] supplied the work. It is not clear as

to whether three (3) or four (4) days after [Brown] completed the well, Chad stated to [Brown] that he was satisfied with [Brown's] well or whether Chad and [Brown] did not discuss the well's performance after [Brown] completed the work. Chad did recall having multiple conversations with [Nifong] about the well's performance, but he could not recall discussing with [Nifong] putting in another well. Chad testified that at one point, either he or [Nifong] attempted to increase the pump's flow rate by "re-nozzling" the pivot. No evidence exists that Chad or [Nifong] ever complained verbally or in writing to [Brown] about any problems or deficiencies with the well and pump's performance, prior to the commencement of this litigation.

(Appellant's App. Vol. II, pp. 128-29).

[15] The evidence in the record supports the trial court's findings and conclusion thereon. Brown's unequivocal testimony stated that he "never guaranteed anyone a flow rate on a well" as you "would have to be pretty silly to do that." (Tr. p. 38). Brown explained that prior to commencing the work, he had drilled a test well which had indicated the presence of a "1,000 gallon[s] a minute well." (Tr. p. 108). On the morning of starting the work, Chad was present and had alluded that "he would like to have 800 gallon[s] a minute." (Tr. p. 24). Brown confirmed that neither Chad nor Nifong had ever informed him that "if the well doesn't make 800 gallon[s] per minute then he does not get paid;" and they had never expressed any dissatisfaction with his work. (Tr. p. 63). As referred to by the trial court in its findings, Chad testified to a conversation with Brown prior to starting the drilling, as follows:

I said, well I have to, you know, can you get me the amount of water that I need? At least the original amount of water we

needed was 800 gallon[s] per minute at 40 psi. And [Brown] told me that, he said, I will be able to get you 700 gallon[s] per minute. Which was lower than the 8; I think he thought he would have 8, but, he said I will get you 700. And – he made that comment multiple times that I will get you 700 gallon[s] per minute.

(Tr. p. 169).

[16] Our review of the record indicates that this was essentially a "he said, she said" controversy between Brown on the one side and Chad and Nifong on the other side regarding whether a condition precedent existed whereby Brown had promised to deliver a 800 gallons-of-water-per-minute well. The trial court clearly credited Brown's testimony over the testimony given by Nifong and Chad, and we will defer to that determination. Even if we were to characterize Brown's statement that he would "get [] 700 gallon[s] per minute" as a condition precedent to being paid, then Brown satisfied the condition as the engineer-approved test tube flow rate indicated a 825 gallons per minute, which decreased after 7 or 8 hours to 775 gallons per minute. Viewing the trial court's findings of fact[1] through the lens of the trial court's credibility determinations

---

[1] Nifong also challenges the trial court's finding in which the court references the testimony of Dalton Davis (Davis), a local well-driller. In this finding, the trial court reiterated Dalton's testimony regarding the inaccuracy of the test method employed by Irrigation Solutions and Dalton's insistence that no well driller ever guarantees a particular flow rate. (*See* Appellant's App. Vol. II, pp. 129-30). Although the trial court acknowledged that Davis' contested testimony about particular flow rates would not aid in resolving the "he said, [s]he said" controversy, the trial court settled Nifong's motion to strike Davis' testimony by letting Davis' "testimony [] stand for what it is." (Tr. pp. 131, 151). We agree with the trial court. Even if Davis' testimony would be stricken, the same evidence would still be before the court as Brown made identical allegations with respect to Irrigation Solutions' methodology and the guarantee of a well's flow rate.

and mindful that "[c]onditions precedent are disfavored and must be explicitly stated," we conclude that the evidence supports the trial court's findings and conclusion thereon.[2] *Sand Creek Country Club, Ltd. v. CSO Architects, Inc.*, 582 N.E.2d 872, 875 (Ind. Ct. App. 1991).

### III. *Claim for Trespass*

[17] Next, Nifong contests the trial court's conclusion that he did not have immediate possessory control of the Property and therefore could not maintain an action for trespass against Brown. Asserting that he is the owner of the irrigation system, including the well equipment, Nifong claims that "the primary concern and need to respond to Brown's unlawful trespass onto the property belongs to" him and not to Chad. (Appellant's Br. p. 25).

[18] Traditionally, in a claim for trespass, "a plaintiff must prove that 'he was in possession of the land and that the defendant entered the land without right.'" *Aberdeen Apartments v. Cary Campbell Realty Alliance, Inc.*, 820 N.E.2d 158, 164 (Ind. Ct. App. 2005), *reh'g denied, trans. denied* (citing *Indiana Michigan Power Co. v. Runge*, 717 N.E.2d 216, 227 (Ind. Ct. App. 1999)). This rule "is based upon the principle that trespass actions are possessory actions and that the right interfered with is the plaintiff's right to the exclusive possession of a chattel or land." *Aberdeen Apartments*, 820 N.E.2d at 164. In *Aberdeen Apartments*, this

---

[2] Because we do not find the existence of a condition precedent, we need not address Nifong's contention that he did not waive the execution of the condition prior to paying Brown.

court determined that a landlord could bring a claim for trespass only for the common areas of the building and not for the areas leased to the tenant. *Id*. at 166. Even though the landlord retained ownership over the entire building, he had a duty to maintain the common areas in a safe condition and therefore retained a "sufficient possessory interest in the common areas of an apartment complex," in which the tenant was only granted a license. *Id*. at 165-66.

[19] Likewise here, while Nifong retained ownership of the Property, the cash lease had transferred the possessory interest in the Property to Chad. Even though we agree with Nifong that he is the owner of the irrigation system on the Property, "everything which belongs to the demised premises in a lease or is used with and is appurtenant to the premises, and which is reasonably necessary to their beneficial use and enjoyment, will be considered as incident to the premises." *Caito v. Indianapolis Produce Terminal, Inc.*, 320 N.E.2d 821, 825 (Ind. Ct. App. 1974). As the record is littered with references that the Property needed the irrigation system to produce high value crops, such as potatoes, the well and pump are reasonably necessary for the Property's use as crop producing land and therefore belonged to the premises which were under Chad's possession. Accordingly, we agree with the trial court's conclusion that because Nifong does not have a possessory interest in the Property, the well, and the well's pump, he cannot maintain an action for trespass against Brown.

IV. *Criminal Conversion*

[20] In a similar vein, Nifong asserts a claim for criminal conversion against Brown for the gearhead Brown's employees removed from the Ousley well. Criminal conversion requires proof that a person knowingly or intentionally exerted unauthorized control over property of another person. Ind. Code § 35-43-4-3. "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." I.C. § 35-41-2-2(a). A person's control over property of another person is "unauthorized" if it is exerted in a manner or to an extent other than that to which the other person has consented. I.C. § 35-43-4-1(b)(2). Distinct from a criminal trial, a claimant in a civil action need only prove by a preponderance of the evidence that the defendant committed the criminal act; a criminal conviction of conversion is not a condition precedent to recovery in the civil action. *French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1166 (Ind. Ct. App. 2008). Nevertheless, the claimant must prove all the elements of the alleged criminal act. *Id*. In any criminal conversion action, criminal intent is an essential element that must be proven. *Id*. at 1166-67. It is this *mens rea* requirement that differentiates criminal conversion from a more innocent breach of contract or failure to pay a debt, which situations the criminal conversion statute was not meant to cover. *Id*.

[21] Focusing on the *mens rea* element, the record supports the trial court's conclusion that Nifong "failed to meet his burden of proof by a preponderance of the evidence[.]" (Appellant's App. Vol. II, p. 136). During the hearing, Brown repeatedly and consistently testified that when his employees removed

his pump from the Property, they also "took [Ousley's] gearhead by mistake," and "without [his] knowledge." (Tr. p. 102). Brown later re-installed Ousley's gearhead onto Ousley's well. Accordingly, as Brown did not intentionally remove the gearhead, Nifong cannot establish an action for criminal conversion.

### IV. *Quantum Meriut and Account Stated*

[22]    Lastly, Nifong contends that the trial court abused its discretion by awarding Brown a judgment pursuant to a *quantum meriut* theory despite the existence of a contract between Nifong and Brown. Brown concedes that "[b]ecause the trial court did find a contract existed," a recovery under the *quantum meriut* theory is unavailable under the circumstances; nevertheless, Brown maintains that the trial court's "decision in [his] favor rightfully rested upon the elements of contract law and it did not need to look to other theories under which [he] could recover." (Appellee's Br. p. 17). Brown concludes that "because there is no indication in the trial court's order that it awarded [Brown] damages relying strictly on *quantum meriut* (or even, at all), as opposed to contract theory, the trial court's order should be affirmed." (Appellee's Br. p. 17).

[23]    First, we agree that the existence of an oral contract forecloses recovery under a *quantum meriut* theory. *See Troutwine Estates Development Co., LLC v. Comsub Design & Engineering, Inc.*, 854 N.E.2d 890, 897 (Ind. Ct. App. 2006) ("Without an express contract, written or oral, a party may recover under the theory of unjust enrichment, or *quantum meriut*."), *trans. denied*.

[24] Secondly, the trial court also appeared to have analyzed and approved an alternative theory of recovery based on "account stated." (Appellant's App. Vol. II, p. 134). "The account stated arose originally out of transactions between merchants and persons engaged in commercial transactions[.]" *Bosson v. Brash*, 114 N.E. 6, 6 (Ind. Ct. App. 1916). It is defined as "an agreement between the parties that all items of an account and balance are correct, together with a promise, express or implied, to pay the balance." *Jackson v. Trancik*, 953 N.E.2d 1087, 1091 (Ind. Ct. App. 2011). An account stated "operates as a new contract without the need for renewed consideration, and the plaintiff does not need to plead and prove the creation and performance of each contract underlying the account." *Id*. As by its definition an account stated is properly used to settle the relationship between a seller of goods or services and a debtor with respect to multiple documented transactions, it is not an appropriate legal vehicle to use in the case before us where there is only a single, contractual transaction disputed.

[25] Nevertheless, despite these two legal avenues discussed by the trial court, in its conclusion, the court concluded that Brown "is entitled to a judgment against [Nifong] in the sum of $29,800.00 principal[,]" as well as that Brown "shall recover from [Nifong] judgment in the sum of $36,055.74[3] plus costs and post judgment interest," without specifying the theory under which this recovery

---

[3] The amount of $36,055.74 includes the prejudgment interest of $6,255.74 awarded by the trial court.

was awarded. (Appellant's App. Vol. II, p. 137). Considering the evidence most favorable to the judgment and in the absence of an explicit theory of recovery, we will assume that the trial court granted judgment based on Nifong's breach of contract. As no condition precedent existed and Brown performed in accordance with the terms of the contract, Nifong breached the contract by failing to pay Brown's invoice. *See Worrell*, 653 N.E.2d at 1057 (a party breaches a contract when he fails to perform all the obligations which he has agreed to undertake). Accordingly, we affirm the trial court's judgment in favor of Brown.

## CONCLUSION

Based on the foregoing, we hold that (1) no condition precedent existed to the verbal contract between Nifong and Brown; (2) Nifong cannot maintain an action for trespass against Brown; (3) Nifong cannot establish a claim for criminal conversion; and (4) the trial court properly awarded judgment in favor of Brown.

Affirmed.

Najam, J. and Bradford, J. concur