**TROUTWINE ESTATES DEVELOP-MENT COMPANY, LLC, Daniel Jordan and Michael D. Jordan and Master Mark, Inc., Appellants–Plaintiffs,**

v.

**COMSUB DESIGN AND ENGINEERING, INC., Appellee–Defendant.**

**No. 45A05–0509–CV–562.**

Court of Appeals of Indiana.

Sept. 29, 2006.

Rehearing Denied Nov. 21, 2006.

R. Brian Woodward, David A. Buls, Casale, Woodward & Buls, LLP, Merrillville, IN, Attorneys for Appellants.

Edward P. Grimmer, Edward P. Grimmer, P.C., Crown Point, IN, Attorney for Appellee.

## OPINION

ROBB, Judge.

### Case Summary

Troutwine Estates Development Company, L.L.C. ("Troutwine"), Daniel Jordan ("Jordan"), Michael D. Jordan, and Mastermark, Inc. ("Mastermark" and collectively the "Developers"), appeal after a bench trial in which the trial court awarded a judgment in favor of ComSub Design and Engineering, Inc. ("ComSub"), in the amount of $72,151.00 for services ComSub provided. The Developers also appeal the trial court's ruling against their counterclaim for professional negligence by ComSub. ComSub cross-appeals, alleging that the trial court improperly limited its recovery.

Quantum meruit may be applied to prevent unjust enrichment where no contract exists. We therefore affirm the trial court's judgment in favor of ComSub for services it provided. The Indiana Business Flexibility Act extends liability protection to individuals involved with a limited liability company. In a matter of apparent first impression for this state, we reverse and remand for the trial court to make findings of fact and conclusions thereon regarding derogation of the individual liability protection of Jordan, Michael D. Jordan, and Mastermark for the debts and obligations of Troutwine, and to modify its judgment as necessary. With regard to the Developers' counterclaim for professional negligence, the trial court did not abuse its discretion when it excluded expert testimony and photo-

graphs offered by the Developers. Lastly, we conclude that the trial court improperly limited its judgment in favor of ComSub when it deducted an amount to prevent double recovery and did not grant prejudgment interest. Consequently, we affirm in part, reverse in part, and remand for further proceedings with regard to assignment of personal liability, as well as adjustment of the amount to which ComSub is entitled in damages.

### Issues

The Developers raise four issues for review, which we reorder, consolidate, and restate as follows:

1. Whether the trial court properly concluded no contract existed, therefore employing quantum meruit in reaching its judgment;

2. Whether the trial court properly assigned personal liability to each individual defendant for the debts and obligations of Troutwine; and

3. Whether the trial court properly excluded testimony and photographs supporting the Developers' counterclaim for professional negligence.

ComSub raises two issues on cross-appeal, which we consolidate and restate as whether the trial court properly limited judgment in ComSub's favor by excluding certain amounts to avoid double recovery and by not imposing prejudgment interest.

### Facts and Procedural History [1]

Between 1992 and 1998, ComSub provided design and engineering services to Troutwine, a limited liability company formed for the purpose of improving properties in a subdivision outside of Crown Point, Indiana, through addition of streets, sewers, and utilities. The land was there-

---

1. The order being appealed was not included with the Appellant's Brief, as required under Indiana Appellate Rule 46(A)(10). Counsel is admonished to comply with the Appellate Rules in the future.

after sold for construction of multifamily dwellings. The owner of ComSub, Steve Manich, was one of Troutwine's three managers, along with Jordan, and Jordan's son, Michael. The Jordans also own Mastermark, the construction company that eventually purchased the land from Troutwine and built the dwellings.

In 1994, Manich gave Jordan a document entitled "Agreement for Engineering Services" ("Agreement"). Its provisions included "design phase" and "construction phase" services, as well as payment rates for each. Appellant's Appendix at 35–37. Design phase services included: (1) meeting with government officials for determination of requirements for subdivision; (2) performance of field surveys for preparation of plats; (3) rendering engineering designs, plans, and drawings including streets, sewers, and other project improvements; (4) furnishing these plans and plats; and (5) assisting in receiving bids for the improvements. Construction phase services included: (1) setting construction stakes for sewers, water mains, grading, curbing, and other improvements; (2) preparing individual lot surveys, setting foundation stakes, and building permit plats; (3) setting permanent iron markings at property corners; and (4) "[p]rovid[ing] general supervision, detailed inspection, and/or other services not covered by this agreement or as ordered by [Troutwine]." *Id.* at 36. Design phase payment was established as "a lump sum fee based on the total number of acres of the project multiplied by Eight Hundred and Ten Dollars ($810.00) per acre." *Id.* Construction phase payment was "based on a per diem rate based on the number of hours of services performed by the hourly rates set forth in Section H." *Id.* Manich's applicable hourly rate was as a "principal" earning ninety dollars per hour. *Id.* at 37. Jordan did not sign the Agreement. Nevertheless, Manich informed Jordan that services

performed by ComSub would be under the terms written in the Agreement.

ComSub received payment under the Agreement's terms for the design phase services it provided. After completion of the design phase, Troutwine directed ComSub to make revisions and changes to the plans and to perform general construction observation by monitoring the construction of improvements, for which Manich generated a cost analysis of the work performed on each lot of the project. ComSub received payment only for the construction phase service of setting stakes. The total amount paid to ComSub for design and construction phase services was $68,750.15. In addition, payments were also made directly to Dale Catt and Larry McClelland for setting stakes, totaling $9,740.00. Testimony at trial indicated that Catt and McClelland were subcontractors, although the trial court also referred to them as ComSub employees.

In 1998, after a dispute with Jordan, Manich quit the project. He later submitted three separate invoices for services provided, but for which Troutwine had not paid. The first was a September 2, 1998, invoice in the amount of $67,050.00 for engineering construction supervision provided between 1995 and 1997. The second was a September 24, 1998, invoice in the amount of $9,720.00 for revision of street names and address changes. The third invoice was dated October 22, 1998, in the amount of $5,130.00 for calculations of cost distribution for work performed on each lot. These invoices did not itemize amounts, hours, costs, or scope of work performed. However, Troutwine did not dispute the hours reported or the performance of the work, yet refused to pay ComSub.

ComSub filed a complaint for payment in May of 1999. The Developers filed a

counterclaim alleging professional negligence by ComSub and Manich. Each party requested summary judgment, which the trial court denied. A bench trial followed in which the parties requested written findings and conclusions thereon. During the evidence on the Developers' counterclaim for professional negligence, the trial court excluded expert testimony and photographic evidence offered by the Developers. On January 24, 2005, the parties submitted proposed special findings and conclusions.

The trial court determined that the unsigned written contract did not constitute an express contract, written or oral, between ComSub and Troutwine. It also concluded that there was a lack of evidence of mutual assent or a meeting of the minds, resulting in no contract being formed. Instead, the trial court applied the equitable doctrine of quantum meruit, requiring that ComSub be compensated for services it rendered to avoid unjust enrichment of Troutwine. The trial court also concluded that the Developers failed to meet the burden of proof in their counterclaim against ComSub and Manich for professional negligence. Judgment was entered for ComSub on September 1, 2005, in an amount totaling $72,151.00. This represented the total amounts in ComSub's invoices ($81,900.00), reduced by the total amount paid to Catt and McClelland ($9,740.00) in order to prevent a double recovery.[2] The trial court denied ComSub's request for prejudgment interest.

The Developers now appeal the judgment's basis in quantum meruit, as well as the imposition of personal liability upon Jordan and the other individual defendants. ComSub cross-appeals, calling into question the trial court's decisions in limitation of the amount it was awarded.

*Discussion and Decision*

When the trial court enters specific findings of fact and conclusions with respect to a final judgment, we apply a two-tiered standard of review. *S.C. Nestel, Inc. v. Future Constr., Inc.,* 836 N.E.2d 445, 449 (Ind.Ct.App.2005). We first address whether the evidence supports the findings, and then whether the findings support the judgment. *Id.* The trial court's findings and conclusions will be set aside only if they are clearly erroneous. *Id.* A judgment is clearly erroneous when a review of the record indicates that it contains no facts or inferences supporting the trial court's findings and conclusions, therefore leaving us with a firm conviction that a mistake has been made. *Id.* We do not reweigh the evidence or reassess witness credibility, but consider only the evidence most favorable to the judgment. *Id.* However, where a pure question of law is involved, our standard of review is de novo. *Id.*

The Developers appeal from a negative judgment on their counterclaim. A party who had the burden of proof at trial appeals from a negative judgment and will prevail only if it establishes that the judgment is contrary to law. *Helmuth v. Distance Learning Sys. Ind., Inc.,* 837 N.E.2d 1085, 1089 (Ind.Ct.App.2005). A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead only to one conclusion, but the trial court reached a different conclusion. *Id.*

### I. Quantum Meruit

The facts as determined by the trial court are not in question. Rather, with regard to the award of damages to ComSub, the Developers argue that the trial

---

**2.** By our figures, the trial court miscalculated by $9.00, because $81,900 less $9,740 is $72,160, not $72,151. We cannot determine a basis for this discrepancy.

court misapplied the doctrine of quantum meruit. Whether a set of facts establishes a contract is a question of law, which we review de novo. *Kelly v. Levandoski*, 825 N.E.2d 850, 857 (Ind.Ct.App.2005), *trans. denied.*

■ The existence of a contract is established by evidence of an offer, acceptance, consideration, and a manifestation of mutual assent. *Ind. Dep't. of Corr. v. Swanson Servs. Corp.*, 820 N.E.2d 733, 737 (Ind.Ct.App.2005), *trans. denied.* "To bring a contract into existence, an offer must be extended and the offeree must accept it, the communication of acceptance being crucial. Thus, a meeting of the minds between the contracting parties is essential to the formation of a contract." *Id.* This meeting of the minds must extend to all essential elements or terms for a contract to be binding. *Id.* Likewise, "[f]or an oral contract to exist, parties have to agree to all terms of the contract." *Kelly*, 825 N.E.2d at 857. "If a party cannot demonstrate agreement on one essential term of the contract, then there is no mutual assent and no contract is formed." *Id.*

■ Without an express contract, written or oral, a party may recover under the theory of unjust enrichment, or quantum meruit. *Id.* at 860. In such circumstances, a party may be permitted to recover the " 'value of services rendered just as if there had been a true contract.' " *Id.* at 860 (quoting *Wallem v. CLS Indus., Inc.*, 725 N.E.2d 880, 890 (Ind.Ct.App. 2000)). For recovery under quantum meruit, it must be demonstrated that a benefit was rendered to another party at the express or implied request of that party, that allowing the defendant to retain the benefit without paying for it would be unjust, and that the plaintiff expected payment. *Id.* at 861.

■ Here, the trial court concluded as follows:

5. The unsigned contract submitted by Manich does not constitute an express contract, written or oral, between ComSub and Troutwine. There is no evidence of any mutual assent. Accordingly, there is no meeting of the minds and no contract was formed.

6. There is a distinction between design work and construction work. Although ComSub was fully compensated for the design work, ComSub did perform construction work at the request of Daniel Jordan on behalf of Troutwine and is entitled to compensation. The failure to compensate ComSub would result in unjust enrichment.

Appellant's App. at 10. As a result, the trial court awarded ComSub the amounts it requested for construction phase services performed. The Developers argue that the trial court's ruling is contrary to law because a contract existed between the parties, thus precluding application of quantum meruit. We disagree.

The Developers and ComSub both point to the Agreement as the contract between the parties, covering both design work and construction work. The Developers argue that the existence of the contract is evidenced by mutual assent to be bound and requisite definiteness of terms. Specifically, the Developers point to the Agreement's designation of the subject and parties involved, and the outline of services to be performed as well as the calculation and disbursement of payments. To supply mutual assent, the Developers suggest that the conduct of the parties, via performance by ComSub and payment by Troutwine in line with the provisions of the Agreement, substitute for signatures on the written document. However, while the parties

may believe that a contract was formed, the dispute over payment of ComSub's invoices demonstrates a lack of agreement on at least one essential term and the scope of construction services to be performed by ComSub.

We cannot rely upon the written language of the Agreement in this circumstance. The uncontroverted facts are that ComSub began work in 1992, and presented the written Agreement to Jordan and Troutwine in 1994. Thus, no contract existed between the parties although work had begun prior to ComSub's offer. Jordan never indicated acceptance by signing the document. Manich indicated to Jordan that any services performed by ComSub would fall under the Agreement, creating a second, oral, offer by ComSub that incorporated the Agreement's written terms. There is no evidence that Jordan accepted the offer at that time. Regardless, ComSub performed services within the Agreement's provisions for both design and construction, and Troutwine paid ComSub for the majority of those services. However, when Manich decided to leave the project, and submitted three invoices for construction observation, cost distribution analysis, and design revision and changes, a dispute arose over whether Troutwine and ComSub had any agreement for the provision of and payment for those services. The dispute sufficiently demonstrates disagreement on at least one essential term, and thus, a lack of mutual assent that prevents the formation of a binding contract. *See Kelly*, 825 N.E.2d at 857. As such, the trial court was not precluded from employing the doctrine of quantum meruit. Clearly, a benefit was bestowed upon Troutwine by ComSub's provision of services, for which ComSub expected payment, and which would result in unjust enrichment if retained by Troutwine without payment. ComSub was therefore entitled to payment for the invoiced services.

## II. Personal Liability

After concluding that ComSub was entitled to payment for the services at issue, the trial court ordered judgment for ComSub "against Defendants Troutwine, et al." Appellant's App. at 11. On appeal, the Developers contend "it was not argued nor was any evidence ever presented which would entitle [ComSub] to a personal judgment against Dan Jordan, Michael D. Jordan or Mastermark." Appellant's Brief at 12. Assignment of personal liability for the obligations or debts of an Indiana limited liability company is a matter of first impression for this court.

■■■■ As recognized in the trial court's findings, Troutwine is a limited liability company principally based in Lake County, Indiana. Manich, Jordan, and Michael D. Jordan, who act as the company's sole managers, are the only three individuals associated with Troutwine. The purpose of a limited liability company is to provide individuals the same protection enjoyed by shareholders of a corporation through creation of a distinct legal entity, while at the same time featuring pass-through taxation similar to that enjoyed by partners. *Five Star Concrete, L.L.C. v. Klink, Inc.*, 693 N.E.2d 583, 586 (Ind.Ct. App.1998). The Indiana Business Flexibility Act controls the creation and operation of limited liability companies in Indiana. *Brant v. Krilich*, 835 N.E.2d 582, 592 (Ind. Ct.App.2005). In terms of personal liability, the Indiana Business Flexibility Act states:

> A member, a manager, an agent, or an employee of a limited liability company is not personally liable for the debts, obligations, or liabilities of the limited liability company, whether arising in contract, tort, or otherwise, or for the acts or omissions of any other member,

manager, agent, or employee of the limited liability company. A member, a manager, an agent, or an employee of a limited liability company may be personally liable for the person's own acts or omissions.

Ind.Code § 23–18–3–3(a). Thus, individuals associated with a limited liability company are not personally liable merely because of their ownership in the entity, while at the same time, association with a limited liability company does not preclude liability for one's own actions or omissions.[3]

■■■ Because the Indiana Business Flexibility Act provides protections to limited liability companies like those of corporations, to circumvent those protections we apply an analysis similar to that for determining the personal liability of a corporation's officers. *Brant*, 835 N.E.2d at 590. We note that courts in other jurisdictions generally do the same by considering factors necessary to pierce the corporate veil. *See, e.g., People v. Pac. Landmark*, 129 Cal.App.4th 1203, 1212, 29 Cal.Rptr.3d 193 (Cal.Ct.App.2005) ("While generally members of a limited liability company are not personally liable for judgments, debts, obligations, or liabilities of the company 'solely by reason of being a member' (Corp. Code, § 17101, subd. (a)), they are subject to liability under the same circumstances and to the same extent as corporate shareholders under common law principles governing alter ego liability and are personally liable under the same circumstances and extent as corporate shareholders."); *Retropolis, Inc. v. 14th Street Dev., LLC*, 17 A.D.3d 209, 797 N.Y.S.2d 1, 2, (N.Y.App. Div.2005) (denying plaintiff's attempt to avoid the statutory bar to a cause of action by using the doctrine of piercing the corporate veil as applied to limited liability companies); *Bonner v. Brunson*, 262 Ga. App. 521, 585 S.E.2d 917, 918 (Ga.Ct.App. 2003) ("A court may disregard the separate LLC entity and the protective veil it provides to an individual member of the LLC when that member, in order to defeat justice or perpetrate fraud, conducts his personal and LLC business as if they were one by commingling the two on an interchangeable or joint basis or confusing otherwise separate properties, records, or control."); *KLM Indus., Inc. v. Tylutki*, 75 Conn.App. 27, 815 A.2d 688, 689 n. 2 (2003) ("Although we disagree with the court's decision to pierce the corporate veil, we agree with the court that the determination of whether to pierce the corporate veil of a stock corporation or to disregard the protections afforded a limited liability company requires the same analysis.").

■■■ In *Aronson v. Price*, 644 N.E.2d 864, 868 (Ind.1994), our supreme court explained that proper adherence to corporate formalities is a factor in determining whether a plaintiff has met its burden of proof in seeking to impose personal liability on a shareholder for acts of the corporation. "Lack of observance of formalities can provide circumstantial evidence of shareholder abuse and shareholder use of the corporation as a conduit for personal affairs." *Id.* To meet its burden, the plaintiff may also present evidence showing:

> (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporate shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling

---

**3.** Additionally, although not raised by the present case, we note that a member of a limited liability company may contract with other members to be personally liable for the company.

of assets and affairs; ... or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Brant,* 835 N.E.2d at 590. Thus, in deciding whether to pierce the corporate veil or circumvent the protections of a limited liability corporation, "[a] court engages in a highly fact-sensitive inquiry." *Id.*

In support of the trial court's determination in the present case, ComSub argues that "Jordan used [Troutwine] as merely his alter ego." Appellee's Brief at 11. Without citation to the record, ComSub claims that Jordan failed to transfer ownership of the land to Troutwine, yet used Troutwine's money to pay the mortgage on the land. Also without citation to the record, ComSub alleges that Troutwine was used as Mastermark's banker, and paid for the construction company's stake-setting. In addition, ComSub argues that Jordan failed to satisfy necessary formalities, but points only to corporate requirements such as holding meetings and maintaining minutes. Lastly, ComSub suggests that Jordan, his son Michael, and their jointly-owned company Mastermark have admitted personal liability by pursuing a counterclaim in their own names rather than on behalf of Troutwine.

It is unclear the extent to which the trial court relied on this or other evidence presented at trial in rendering judgment. The trial court did not enunciate findings of fact with regard to the personal liability of Jordan, his son Michael, or Mastermark. Nor did the trial court draw conclusions in this regard. Without findings and conclusions that support the judgment, we cannot say the trial court properly assigned personal liability. Because this is a highly fact-sensitive determination, it is properly within the province of the trial court as the finder of fact, and we will not impose upon its discretion. However, without assigning weight to the evidence, we note that Com-Sub bears the burden of proof with regard to each individually named defendant. We also note that it is unclear whether Troutwine's limited liability protection extends to Mastermark, a separate entity not affiliated with Troutwine as a member or manager, and with which Troutwine appears to have arranged for construction services. Ultimately, each individual defendant's insulation from liability is also questionable because the basis for judgment was to prevent unjust enrichment, not because of a signed contract between ComSub and Troutwine. Thus, the benefit of ComSub's performance did not necessarily accrue to Troutwine, but instead may have accrued to individual defendants, who would therefore be liable for the value of those services. In order to clarify the trial court's basis for judgment, we remand on the issue of the individual liability of Daniel Jordan, Michael D. Jordan, and Mastermark.

### III. Appeal on Counterclaim

■ In its consideration of the Developers' counterclaim against ComSub for professional negligence, the trial court looked to whether the Developers established "(1) a duty which arises from employment of the professional; (2) a breach of duty by a departure from the standard of care, i.e., the exercise of ordinary skill and knowledge (for that profession); and (3) that departure from the standard of care caused injury; and (4) injuries/damages." Appellant's App. at 10. The trial court concluded that the Developers did not meet their burden of proof, and therefore entered judgment for ComSub and Manich. The Developers now appeal, arguing that the trial court improperly excluded testimony by its expert witness and photographic evidence that would have met the burden of proof. We will reverse a trial court's decision to exclude evidence

only for an abuse of discretion, or in other words, if that decision is clearly against the logic and effect of the facts and circumstances before this court, or the reasonable, probable and actual deductions to be drawn therefrom. *Wallace v. Meadow Acres Mfrd. Hous., Inc.*, 730 N.E.2d 809, 812 (Ind.Ct.App.2000), *trans. denied.*

## A. Expert Testimony

The Developers' counterclaim for professional negligence arose from an allegation that street drainage was incorrectly designed by ComSub, resulting in manholes at the wrong height and standing water. As part of their case, the Developers sought to introduce the testimony of Michael Cap, a consultant with an extensive background in civil engineering, as an expert on drainage problems. Despite Cap's background, the trial court refused his testimony because he lacked knowledge of Lake County's standards for storm water drainage between the years 1992 and 1995. As a result, the trial court concluded that Cap could not testify as to the severity of the drainage problem at issue because he was unfamiliar with the standard of care with which ComSub was required to comply. The Developers now appeal the trial court's determination and argue Cap should have been permitted to testify.

 Whether a person qualifies as an expert witness is within the trial court's sound discretion, and we will reverse only upon a showing that the trial court abused its discretion. *Mitchell v. State*, 813 N.E.2d 422, 431 (Ind.Ct.App.2004), *trans. denied.* Indiana Evidence Rule 702 states that a witness may be qualified as an expert by virtue of "knowledge, skill, experience, training, or education." Only one of these characteristics is necessary for an individual to qualify as an expert. *Kubsch v. State*, 784 N.E.2d 905, 921 (Ind.2003). Here, the trial court focused on the stan-

dard of care required to determine a breach of duty as being whether "[ComSub's] designs and if this construction comported with the regulations in place by the County at the time." Transcript at 273. Although the trial court found Cap "qualified certainly in the field of engineering," it did not consider him "knowledgeable enough of ... local regulations and rules for him to opine." *Id.*

The Developers first contend that the trial court should not have relied upon the "modified locality rule," which was abolished by the Indiana Supreme Court in *Vergara v. Doan*, 593 N.E.2d 185 (Ind. 1992). Appellant's Br. at 20. In medical malpractice cases prior to *Vergara*, Indiana imposed a standard of care upon physicians of " 'that degree of care, skill, and proficiency which is commonly exercised by ordinarily careful, skillful, and prudent [physicians], at the time of the operation and *in similar localities.*' " *Vergara*, 593 N.E.2d at 186 (quoting *Burke v. Capello*, 520 N.E.2d 439, 441 (Ind.1988) (emphasis added)). This rule evolved with the purpose of preventing "the inequity that would result from holding rural doctors to the same standards as doctors in large cities." *Id.* Deeming this of less concern in the modern state of medicine, our supreme court imposed a new standard of care upon physicians in a medical malpractice context: "a physician must exercise that degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class to which he belongs, acting under the same or similar circumstances." *Id.* at 187. The supreme court explained that "[r]ather than focusing on different standards for different communities, this standard *uses locality as but one of the factors* to be considered in determining whether the doctor acted reasonably," along with other considerations such as

advances in the profession. *Id.* (emphasis added).

■ The Developers seem to argue for a similar shift in the present case, which would permit Cap to testify regardless of his lack of familiarity with Lake County's regulations in place at the time ComSub performed services. However, the Developer's reliance on *Vergara* is misplaced. Our supreme court's discussion and abolition of the modified locality rule was constrained by its context, medical malpractice. Indeed, the supreme court noted at the outset of *Vergara* that medical malpractice cases operate under a "more specific articulation" of the standard of care than in most other negligence actions. *Id.* at 186. Although it is true that the trial court imposed a defined standard of care in the present case, it did so in a general sense, with regard to professional services. In fact, the trial court cited case law discussing the standard of care imposed upon the legal profession, not the medical profession, in establishing the Developers' burden of proof.

That aside, even if the trial court should have held ComSub to the standard of care articulated in *Vergara*, it would make no difference. ComSub and Manich would have been required to exercise a degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent engineers in the same class to which they belong, acting under the same or similar circumstances. These circumstances include the standards embodied in Lake County's local regulations and rules, with which Cap was unfamiliar. Absent this knowledge, he could not testify to the requisite standard of care, and therefore could not testify as to the extent that ComSub's alleged negligent design differed from that standard. Thus, we cannot say that the trial court abused its discretion in refusing to qualify Cap as an expert due to his lack of familiarity with the standard of care.

The Developers' otherwise argue that Cap's "opinions were not even dependent upon any local municipal ordinance," that mere compliance with a statute or ordinance does not necessarily constitute reasonable care, and that Cap's specific knowledge is not determinative of his qualification or the admissibility of his testimony. Appellant's Br. at 20, 22. These arguments miss the point. In fact, the local regulations and rules at the heart of this issue are necessary to establish the minimum standard of care. Without this baseline, the trial court would have no way to determine whether ComSub breached its professional duty of care, and therefore acted negligently.

■ Generally, in order for the finder of fact to know if a professional has complied with the applicable standard of care, a party must present expert testimony establishing that standard of care. *Snyder v. Cobb*, 638 N.E.2d 442, 445–46 (Ind.Ct.App.1994), *trans. denied.* Even a "bare assertion" by the expert witness of familiarity with the standard of care is adequate. *Id.* at 46. Here, Cap's qualification as an engineer, and ability to testify as to the severity of drainage problems, is not in question. However, Cap was unable to make even a bare assertion of familiarity with the applicable standard of care, leaving open the question of whether and to what extent ComSub's design was substandard. As such, Cap's testimony should have depended upon Lake County's local rules and regulations regarding storm water drainage between the years 1992 and 1995. Without this familiarity, we cannot say the trial court erred when it excluded his testimony.

### B. Photographs

Because we conclude that the trial court properly refused to qualify Cup as an ex-

pert witness, therefore excluding his testimony, we agree with the trial court that the Developers failed to establish the requisite elements in their counterclaim for professional negligence. Therefore, we need not reach the issue of whether the trial court properly excluded photographs offered by the Developers to illustrate the alleged professional negligence in design and supervision. Even so, for completeness, we briefly address this matter, reviewing the trial court's refusal to admit photographic evidence for an abuse of discretion. *Hulfachor v. State*, 735 N.E.2d 214, 217 (Ind.2000).

During direct examination of Jordan, Troutwine sought to enter into evidence a group of photographs meant to assist the trial court in understanding problems allegedly encountered due to faulty work by ComSub. These 110 photos were taken at various times between 1994 and 2004. Although they were undated, Jordan claimed the photos were taken as different problems arose. The trial court refused to enter the group of photographs as a whole, along with a list of numbered captions for each photo, due to a lack of foundation. As a result, the Developers sought to provide an adequate foundation on a photo-by-photo basis. Jordan was shown each photograph, and testified to the year and season in which the photo was taken. Afterward, Jordan was subjected to voir dire by ComSub, and admitted that for many photos he had given the wrong seasons based on the clothing and tree foliage depicted. He also agreed that he was "estimating" the seasons and years based on when he believed the problems arose, not upon personal knowledge of when the photos were actually taken. Tr. at 177. The trial court deemed the photos inadmissible for a lack of foundation.

 "In authenticating a photograph, a witness must establish that the photograph is a true and accurate representation of what it is meant to portray." *Martin v. State*, 784 N.E.2d 997, 1007 (Ind. Ct.App.2003). Here, at no time was Jordan asked whether a particular photograph, or the entire group of photographs, truly and accurately represented what was intended to be portrayed. Instead, Jordan guessed, often incorrectly, as to when during the ten-year span each was taken. If Jordan could not accurately testify as to when the photos were taken, we find it difficult to see how he could say they were true and accurate representations of what they were meant to portray. Even had Jordan been able to testify as to the exact dates of the photographs, he still would not have claimed each to be a true and accurate representation of the problems resulting from ComSub's alleged negligence. Accordingly, we cannot say that the trial court erred in excluding these photos due to a lack of proper foundation.

## IV. Issues on Cross–Appeal

On cross-appeal, ComSub argues that the trial court improperly limited its recovery by reducing the judgment's total amount to prevent apparent double recovery, and by not awarding prejudgment interest. We take each contention in turn.

### A. Double Recovery

ComSub takes issue with the trial court's finding that Catt and McClelland were paid as ComSub employees. The payments at issue were made directly by Troutwine and Jordan, for which Jordan requested credit toward any adverse judgment. ComSub disagrees that Catt and McClelland were ComSub employees, and therefore argues the trial court incorrectly concluded that the judgment awarded for ComSub should be reduced by the total amount paid directly to these individuals. Regardless of Catt and McClelland's clas-

sification as subcontractors or employees, there was no threat of double recovery.

It is undisputed that Catt and McClelland provided services of value to Troutwine and were paid directly for those services after their initial paycheck, which came from ComSub instead of Troutwine. Jordan testified that he was uncertain why Catt and McClelland were paid individually, although testimony by Manich explained that they were members of the field crew that performed stake-setting. The invoices at issue were for services provided by Manich, based on the type of work he performed (construction observation, design revision and changes, and cost distribution analysis) and the number of hours he committed to doing so. No evidence was offered to show Catt or McClelland provided a portion of the services listed in Manich's invoices, or that the invoices included amounts representing the value of services rendered by Catt or McClelland. Manich was entitled to payment for the full value of his services under quantum meruit. To provide otherwise results in the partial unjust enrichment of Troutwine, to the detriment of Manich and ComSub, based on the amount paid to Catt and McClelland for unrelated services. Consequently, we conclude that the trial court improperly limited Com-Sub's judgment by subtracting the total amount paid to Catt and McClelland by Jordan and Troutwine.

### B. Prejudgment Interest

The trial court summarily denied ComSub's request for prejudgment interest on the amount awarded to it in judgment. ComSub now argues the trial court should have permitted recovery of prejudgment interest so that it may be fully compensated for amounts invoiced since November of 1998. We agree.

An award of prejudgment interest is not generally considered a matter of discretion. *INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 578 (Ind.Ct. App.2003) *trans. denied.* Rather, in a contract action, such an award is warranted if the amount of the claim " 'rests upon a simple calculation and the terms of the contract make such a claim ascertainable.' " *Id.* (quoting *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1140 (Ind.Ct. App.2002)). "The award is considered proper when the trier of fact need not exercise its judgment to assess the amount of damages." *Id.*

Here, the judgment resulted from application of quantum meruit rather than the terms of a contract. Nonetheless, the amount of the claim required a simple calculation by the trial court, namely the addition of the amounts invoiced by Manich. The trial court found "no significant or substantial dispute to controvert the hours reported by ComSub in invoices, or the work having been performed." Appellant's App. at 9. Although the trial court exercised its judgment in determining that ComSub was entitled to damages for the value of services rendered, it did no valuation assessment of those services beyond the undisputed invoiced amounts. Therefore, an award of prejudgment interest was warranted and proper.

### Conclusion

The trial court properly awarded Com-Sub the value of the services it provided in order to prevent the unjust enrichment of the Developers. However, in fashioning the award, the trial court failed to make findings of fact or conclusions thereon with regard to its assignment of individual liability upon Jordan, Michael D. Jordan, and Mastermark. The trial court did not abuse its discretion when it excluded expert testimony and photographs offered by the Developers in support of their counter-

claim. However, it improperly limited judgment in favor of ComSub by subtracting an amount to avoid double recovery, and by not imposing prejudgment interest on the invoiced amounts. We therefore affirm in part, reverse in part, and remand for further proceedings and modification of judgment.

Affirmed in part, reversed in part, and remanded.

SHARPNACK, J., and NAJAM, J., concur.