


FILED

Dec 13 2024, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Teachers Credit Union,

*Appellant-Defendant*

v.

Kimberly Cripe, individually and on behalf of all others similarly situated,

*Appellee-Plaintiff*

---

December 13, 2024

Court of Appeals Case No.
24A-PL-698

Appeal from the Elkhart Superior Court

The Honorable Stephen R. Bowers, Judge

Trial Court Cause No.
20D02-2308-PL-197

---

**Opinion by Senior Judge Crone**
Judges Tavitas and Weissmann concur.

**Crone, Senior Judge.**

## Case Summary

[1] Kimberly Cripe is a member of and has a checking account with Teachers Credit Union (TCU) n/k/a/ Everwise Credit Union. Cripe filed a putative class action complaint against TCU regarding the assessment of fees related to overdraft transactions for checking accounts. TCU filed a motion to compel arbitration and dismiss Cripe's complaint, asserting that Cripe had agreed to arbitrate any and all disputes arising out of or relating to her account. The trial court denied TCU's motion. On appeal, TCU argues that the trial court's ruling is erroneous. We disagree and therefore affirm.

## Facts and Procedural History[1]

[2] "In order to open a deposit account with TCU, an individual must be a member of the credit union." Appellant's App. Vol. 2 at 121 (affidavit of Jackie Gregg, TCU's assistant vice president of compliance).[2] To become a member of and "qualify to open a deposit account with TCU, the individual must meet the qualifications of being a member of the credit union under the credit union's bylaws, submit a signed membership application, and have that membership application approved by the credit union." *Id*. According to Gregg, "The

---

[1] We heard oral argument at Notre Dame Law School on October 28, 2024, as part of this Court's Appeals on Wheels program. We thank the administration, faculty, and staff for their warm welcome and support, the students for their thoughtful post-argument questions, and counsel for their excellent advocacy and participation in the question-and-answer session.

[2] TCU submitted Gregg's affidavit in support of its motion to compel arbitration, and it submitted Gregg's supplemental affidavit (see below) in its reply to Cripe's response to its motion.

membership application is one of the integral documents that constitute the written contract governing a member's deposit account with TCU, along with the credit union's Term and Conditions and Fee Schedule." *Id*. at 122.[3] "The membership application is signed at the same time that the member opens the deposit account and receives the Terms and Conditions and Fee Schedule." *Id*.

[3] In November 2011, Cripe applied to be a member at a TCU branch. She signed a membership application (Membership Application) that contained the following language:

> By signing below, the undersigned agree[s] to the Credit Union by-laws and the Terms and Conditions of any approved account, as amended from time to time …. The undersigned certif[ies] that information provided on [this application] is true and correct and that the terms on the application apply to all accounts held by the undersigned at this credit union.

*Id*. at 125. The Terms and Conditions stated, "This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully. If you sign the signature card or open or continue to use the account, you agree to these rules." *Id*. at 151. They also contained the following provision: "**AMENDMENTS AND TERMINATION** – We may change our

---

[3] Cripe does not specifically dispute this averment. *Cf. Salcedo v. Toepp*, 696 N.E.2d 426, 435 (Ind. Ct. App. 1998) ("In the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction will be construed together in determining the contract.").

bylaws and any term of this agreement. Rules governing changes in rates are provided separately. For other changes we will give you reasonable notice in writing or by any other method permitted by law." *Id*.

[4] "In the Membership Application, Cripe provided TCU with an email address with a yahoo.com email domain." *Id*. at 192 (Gregg supplemental affidavit). Cripe's application was approved, and she was assigned a membership checking account. Cripe signed up for HomeBanking using her email address. "HomeBanking allows a member to view their member account online, review statements online and conduct certain transactions online. Members must sign up for HomeBanking as TCU does not sign members up for HomeBanking." *Id*. "In HomeBanking, Cripe also affirmatively opted-in to receive e-statements for her Account. Cripe again provided her email address with a yahoo.com email domain for e-statements." *Id*. According to Gregg,

> If a member is an e-statement member of TCU, this means that the member has agreed to receive all notices concerning their checking account, including notices and disclosures relating [to] TCU's Terms and Conditions, TCU's services, and the availability of monthly periodic account statements, electronically at the email address TCU has on file for that member.

*Id.* at 193.[4]

"Cripe was sent notices concerning her Account, including notices and disclosures relating to TCU's Terms and Conditions, TCU's services, and the availability of Cripe's periodic Account statements, electronically to the yahoo.com email she provided from 2011 onward." *Id.* "From 2011 onward, Cripe was also able to access information regarding her Account, including notices and disclosures relating to TCU's Terms and Conditions, TCU's services and her periodic Account statements in HomeBanking." *Id.*

When Cripe opened her account, TCU's Terms and Conditions did not include a dispute resolution clause. "On December 2, 2019, TCU sent all checking account holders, including Cripe, a notice informing them of the impending addition of an Arbitration and Waiver of Class Action provision to TCU's Terms and Conditions ('Notice')." *Id.* at 122.[5] TCU's Terms and Conditions state, "Written notice we give you is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we have on file and/or by email addressed to the email address we have on file." *Id.* at

---

[4] Cripe asserts that "TCU never provided any documentation that [she] ever signed up for 'e-notice' to begin with, nor did TCU provide the terms of any e-notice agreement to show what type of e-notice was required." Appellee's Br. at 11. In her supplemental affidavit, Gregg averred that "TCU does not use paper documents for members to opt in to becoming e-statement members. To become e-statement members, members must electronically enroll themselves." Appellant's App. Vol. 2 at 193. Gregg further averred, "While TCU has no 'documents' to demonstrate Cripe opted in to becoming an e-statement member, TCU's electronic system and databases, identify Cripe as an e-statement member as set forth herein." *Id.* at 194.

[5] Cripe suggests that this notice was prompted by a class action complaint filed against TCU by another member in August 2019. The purported reason for the notice and the details of that lawsuit are irrelevant for purposes of this appeal.

62. "A hard copy of the Notice was sent to checking account holders who were not e-statement members of the credit union via regular U.S. Mail, addressed to the mailing address TCU had on file for the member." *Id*. at 122. "TCU sent checking account holders who were e-statement members of the credit union, including Cripe, an email containing a hyperlink to TCU's online banking platform, through which members could log into their account and access the Notice." *Id*. at 123.

[7] The subject line of the email was entitled, "You have an important document available for viewing in Online Banking[.]" *Id*. at 128. The body of the email stated, "You have an important eNotice available for viewing in Online Banking. **Action may be required on your part.** Please *log in* to view this important information regarding your account." *Id*. at 129 (underlining replaced with italics). The italicization indicates the aforementioned hyperlink.

[8] "The Notice included a full and complete recitation of the Arbitration and Waiver of Class Action provision ('Arbitration Provision') to be included in TCU's updated Terms and Conditions." *Id*. at 123. That provision provided in pertinent part,

> You and the Credit Union agree that both parties shall attempt to informally settle any and all disputes arising out of, affecting, or relating to your accounts, or the products or services the Credit Union has provided, will provide or has offered to provide to you, and/or any aspect of your relationship with the Credit Union (hereafter referred to as the "Claims"). If that cannot be done, then you agree that any and all Claims that are threatened, made, filed or initiated after the Effective Date (defined below) of

this Arbitration and Waiver of Class Action provision ("Arbitration Agreement"), even if the Claims arise out of, affect or relate to conduct that occurred prior to the Effective Date, shall, at the election of either you or us, be resolved by binding arbitration administered by the American Arbitration Association ("AAA") in accordance with its applicable rules and procedures for consumer disputes ("Rules"), whether such Claims are in contract, tort, statute, or otherwise….

….

2. Effective Date. This Arbitration is effective upon the 61st day after we provide it to you ("Effective Date"), unless you opt-out in accordance with the requirements of the RIGHT TO OPT-OUT provision below.

3. Claims Arising Prior to Effective Date: THIS BINDING ARBITRATION CONSENT AND AGREEMENT APPLIES TO ALL CLAIMS THAT ARE FILED OR INITIATED AFTER THE EFFECTIVE DATE, EVEN IF THE CLAIM ARISES OUT OF, AFFECTS, OR RELATES TO CONDUCT THAT OCCURRED PRIOR TO THE EFFECTIVE DATE. If a Claim is filed or initiated prior to the Effective Date, this Binding Arbitration Consent and Agreement will not apply to such Claim.

….

5. Class Action Waiver. ANY ARBITRATION OF A CLAIM WILL BE ON AN INDIVIDUAL BASIS. YOU UNDERSTAND AND AGREE THAT YOU ARE WAIVING THE RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER IN A CLASS ACTION LAWSUIT.

….

8. Right to Opt-Out. You have the right to opt-out of this Arbitration Agreement, provided you notify the Credit Union of your intent to do so within 60 days after it is provided to you. Your opt-out is only effective if you notify the Credit Union in writing at 110 South Main Street, South Bend, IN 46601 within such 60 day time period. If you fail to opt-out within this 60-day time, you will be deemed to have consented to the resolution of your Claims through binding arbitration. In the event you opt-out, it shall not affect other terms and conditions of your Account Agreement or your relationship with the Credit Union.

*Id*. at 126-27.

[9] "A total of 45 of TCU's members, including e-statement members, opted out of the Arbitration Provision pursuant to the procedures set forth in the Notice." *Id*. at 123. "Cripe did not opt out of the Arbitration Provision." *Id*. She "is still an active member of TCU and has continued to use her checking account years after the opt-out period closed and the Arbitration Provision went into effect for all members who did not opt out of the Arbitration Provision." *Id*.

[10] In April 2023, Cripe filed a putative class action complaint against TCU, which was amended the following month. In her amended complaint, Cripe alleged that TCU's assessment of fees relating to overdraft transactions for checking accounts breached its contracts with its account holders. Cripe alleged that the contracts comprised, among other things, the Terms and Conditions. *Id*. at 18. Cripe further alleged that TCU was unjustly enriched and violated the Indiana Deceptive Consumer Sales Act.

In June 2023, TCU filed a motion to compel arbitration and dismiss Cripe's complaint, alleging that "Cripe assented and agreed to the arbitration of her claims against TCU" by not opting out of the Arbitration Provision and by continuing to use her account. *Id.* at 113. In support of its motion, TCU submitted Gregg's affidavit and some of the foregoing account documents. Cripe filed a response, to which she attached an affidavit from her counsel and accompanying exhibits, one of which indicates that HomeBanking participants are required to click a button to accept the receipt of e-statements for their accounts. *Id.* at 173. Cripe also attached her own affidavit, in which she averred that she had "never agreed to arbitration with [TCU]"; that she was "not aware of any prior 'offer' by [TCU] to enter into any agreement to arbitrate"; and that she would "never agree to allow TCU to add wholly new terms to [her] membership agreement, especially to take away the right to go to court." *Id.* at 176. TCU filed a reply, to which it attached Gregg's supplemental affidavit.

On October 19, 2023, the trial court held a hearing on TCU's motion. On October 29, Cripe filed a notice of supplemental authority regarding our supreme court's recent opinion in *Land v. IU Credit Union*, 218 N.E.3d 1282 (Ind. 2023) (*Land 1*), *aff'd on reh'g*, 226 N.E.3d 194 (Ind. 2024) (*Land 2*), which was handed down on October 24. Cripe argued that *Land* supported her argument that TCU's motion to compel arbitration should be denied "because mere silence and inaction in continuing to maintain accounts is insufficient in these circumstances to show a credit union customer assented to the addition of a new arbitration clause." Appellant's App. Vol. 2 at 196. On November 29,

TCU filed a response, in which it argued that *Land 1* was inapposite. On February 1, 2024, our supreme court issued its opinion on rehearing in *Land 2*.

[13] On February 23, 2024, the trial court entered an order in which it stated that "[t]he parties' dispute centers on whether the Arbitration Provision is enforceable against Cripe." Appealed Order at 5. The substantive portion of the order reads in pertinent part as follows:

> In *Decker v. Star Financial Group, Inc.*, 187 N.E.3d 937 (Ind. 2023), plaintiff account holders brought a class-action suit against their bank for overdraft fees assessed against their checking accounts. The bank filed a motion to compel arbitration, citing the account agreement's addendum that would require arbitration and preclude the class action lawsuit, but the Indiana Supreme Court held that the contract's change of terms provision limited the bank's ability to modify the contract terms, and therefore the provision could not be enforced against the account holders.
>
> Similarly, in [*Land 1*], the account holder brought a class-action suit against her credit union for overdraft fees assessed against her account. The credit union moved to compel arbitration, citing the account agreement's addendum that would require arbitration and preclude the class action lawsuit, arguing that the plaintiff's failure to opt out meant the arbitration addendum was enforceable against her. In reaching the conclusion that the arbitration addendum was not enforceable against the account holder, the Indiana Supreme Court formally adopted the position of Restatement[] 2d of Contracts § 69(1), which provides that a party's silence or inaction only constitutes acceptance under three exceptional circumstances: (a) the offeree's acceptance of services when the offer was made with expectation of compensation; (b) when the offeror states or gives the offeree reason to understand that assent may be manifested by silence or inaction; and (c) where the previous dealings of the parties make it reasonable that

the offeree should notify the offeror if he does not intend to accept. Specifically, the Indiana Supreme Court rejected the idea that the account holder's ongoing use of her checking account constituted acceptance of the arbitration addendum. *Id.*

….

TCU argues that Cripe's ongoing use of her checking account constituted affirmative acts of assent to be bound by the Arbitration Provision, but this so-called affirmative act of Cripe does not appear to be distinguishable from the ongoing use of an account that was specifically rejected as constituting assent to modified contractual terms by the Indiana Supreme Court in [*Land 1*]*, supra*. Indeed, nothing in the parties' agreements indicate[s] to Cripe that her assent to a change of terms may be manifested by silence or inaction, and much like the addendum in [*Land 1*], there was no condition in the Arbitration Provision that conditioned use of the accounts on acceptance of the arbitration addendum. Indeed, the 45 TCU members who did opt out of the Arbitration Provision were allowed to continue to use their accounts without being bound by the Arbitration Provision, just as in [*Land 1*].

The Court declines to find that Cripe's ongoing use of her checking account constituted an affirmative acceptance of the Arbitration Provision sought to be enforced against her in this matter. Because this leaves TCU with—at most—evidence of Cripe's silence or inaction, the evidence before the Court is insufficient to trigger any of the exceptions to the general rule of Restatement 2d of Contracts § 69 as adopted in [*Land 1*]. As TCU has failed to meet its burden of proving the existence of an enforceable arbitration agreement, the Court now DENIES [TCU's] Motion to Compel Arbitration.

Appealed Order at 5-8. TCU now appeals.

## Discussion and Decision

[14] TCU asserts, and Cripe does not dispute, that the Arbitration Provision is governed by the Federal Arbitration Act (FAA), which applies to written arbitration provisions in contracts involving interstate commerce. 9 U.S.C. § 2. Pursuant to the FAA, a written arbitration provision in a contract "shall be valid, irrevocable, and enforceable, save upon such such grounds as exist at law or in equity for the revocation of any contract …." *Id.* "[U]pon being satisfied that the making of the agreement for arbitration … is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

[15] "Congress enacted the FAA to overcome judicial resistance to arbitration and to declare a national policy favoring arbitration of claims that parties contract to settle in that manner." *Brumley v. Commw. Bus. Coll. Educ. Corp.*, 945 N.E.2d 770, 776 (Ind. Ct. App. 2011). Likewise, "Indiana recognizes a strong policy interest in favor of enforcing arbitration agreements." *Land 1*, 218 N.E.3d at 1286. "But our policy favoring arbitration comes with a key qualification. A party cannot be required to submit to arbitration unless it has agreed to do so." *Decker*, 204 N.E.3d at 920. "State law contract principles apply to determine whether parties have agreed to arbitrate." *Brumley*, 945 N.E.2d at 776.[6]

---

[6] TCU touches briefly on "assessing the scope of an arbitration agreement[,]" Appellant's Br. at 18, but it appears that the scope of the Arbitration Provision in this case is not in dispute, i.e., that it encompasses all of Cripe's claims against TCU.

"The party seeking to compel arbitration carries the burden of showing the existence of an enforceable arbitration agreement." *Land 1*, 218 N.E.3d at 1287. "Whether parties agreed to arbitrate a dispute is a matter of contract interpretation." *Decker*, 204 N.E.3d at 920. "When interpreting a contract, the contract must be read as a whole and the court should accept an interpretation of the contract that harmonizes its provisions." *Ind. Gaming Co. v. Blevins*, 724 N.E.2d 274, 278 (Ind. Ct. App. 2000), *trans. denied*. "We also should make every effort to avoid a construction of contractual language that renders any words, phrases, or terms ineffective or meaningless." *Id*. "Courts should presume that all provisions included in a contract are there for a purpose and, if possible, reconcile seemingly conflicting provisions to give effect to all provisions." *Id*. Any ambiguities "should be construed against the party that furnished and drafted the agreement." *Franciscan Alliance Inc. v. Metzman*, 192 N.E.3d 957, 963 (Ind. Ct. App. 2022), *trans. denied* (2023). "We review questions of contract interpretation de novo." *Decker*, 204 N.E.3d at 921. "And we do not defer to a trial court's decision on a motion to compel arbitration but likewise review it anew." *Id*.

"[A]n arbitration agreement, as with a typical contract, requires 'offer, acceptance of the offer and consideration.'" *Land 1*, 218 N.E.3d at 1287 (quoting *Reitenour v. M/I Homes of Ind., L.P.*, 176 N.E.3d 505, 510-11 (Ind. Ct. App. 2021)). "To bring a contract into existence, an offer must be extended and the offeree must accept it, the communication of acceptance being crucial. Thus, a meeting of the minds between the contracting parties is essential to the

formation of a contract." *Troutwine Ests. Dev. Co. v. Comsub Design & Eng'g, Inc.*, 854 N.E.2d 890, 897 (Ind. Ct. App. 2006) (quoting *Ind. Dep't of Corr. v. Swanson Servs. Corp.*, 820 N.E.2d 733, 737 (Ind. Ct. App. 2005), *trans. denied*), *trans. denied* (2007). "And while the parties may modify their contract, such modification, which amounts to a contract itself, requires all the elements of a contract." *Land 1*, 218 N.E.3d at 1287.

[18] As the trial court's order suggests, our supreme court's decisions in *Decker* and *Land 1* are at least instructive, and perhaps dispositive, in addressing whether TCU and Cripe agreed to arbitrate "any and all disputes arising out of, affecting, or relating to [her] accounts[.]" Appellant's App. Vol. 2 at 126. In *Decker*, when the plaintiffs "opened their checking account, they assented to an account agreement that detailed the terms and conditions of their relationship with [Star Financial Bank (Bank)]." 204 N.E.3d at 919. Section 10 of the account agreement stated in pertinent part,

> **Amendments and Termination.** We may change any term of this agreement. Rules governing changes in interest rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other method permitted by law.… Reasonable notice depends on the circumstances …. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s).

*Id*. at 919-20.

The Bank sent the Deckers, who were "e-statement customers," an email with their fourteen-page monthly statement, which contained "(1) ten pages detailing the prior month's transactions; (2) one page of fees; (3) one page of check images; and (4) a two-page addendum to their account agreement providing that claims against the Bank were subject to arbitration and could be brought only in a customer's individual capacity." *Id*. at 920. "The addendum noted that it would become effective within ten days if the Deckers retained their account with the Bank. The monthly statement did not summarize the agreement's revised terms and conditions; it merely included the addendum at the end of the statement." *Id*. "The Deckers did not see or review the addendum, and they did not close their account with the Bank." *Id*.

"The Deckers later filed a class-action complaint against the Bank alleging improper overdraft fees. The Bank responded with a motion to compel arbitration based on the addendum. After a hearing, the trial court granted the Bank's motion to compel arbitration and dismissed the Deckers' complaint." *Id*. "The Deckers appealed, and the court of appeals reversed and remanded for further proceedings." *Id*. The Bank sought and was granted transfer.

The Deckers raised the following arguments:

> (1) the Bank buried notice of the addendum at the end of their monthly statement and thus did not provide the contractually required reasonable notice; (2) the account agreement's change-of-terms clause did not allow the Bank to add the addendum; and (3) the continued use of their checking account did not manifest their assent to the addendum.

*Id*. at 921. Because it was dispositive, the court addressed only the second argument and held that "the specific language of the account agreement's change-of-terms clause did not permit the Bank to add the addendum. Thus, the addendum was not a valid amendment to the account agreement." *Id*.

[22] The court explained its rationale as follows:

> The agreement's operative provision is Section 10, which allows the Bank to "change any term of this agreement." The Bank proceeded here as if the account agreement's change-of-terms clause gave it a blank check to amend the agreement any way it saw fit to fend off threatened litigation. But Section 10—which the Bank itself wrote—is not so elastic. This section does not say the Bank can change the agreement however it wants. If the Bank wanted such flexibility, it might have given itself the power to "change this agreement" as desired. Instead, the section is more limited in scope. It limits the Bank to changing "any term of this agreement." Words matter. The difference between a far-reaching power to amend "**this** agreement" and the narrower power to amend "**any term** of this agreement" makes all the difference on this record. The latter—which governs here—limits the Bank to modifying the terms that existed in the original account agreement. Relevant here, the original agreement contained neither a general dispute-resolution provision nor a specific arbitration or no-class-action provision. Thus, there was not "any term" of that agreement the Bank could "change" to effectuate the result it sought here through its addendum. Because the original account agreement did not mention dispute resolution generally or arbitration or class action specifically, Section 10 did not permit the Bank to add such provisions by amendment. To conclude otherwise would violate Section 10.

*Id.*[7] Consequently, the court reversed the trial court's judgment and remanded for further proceedings.

[23]    In *Land 1*, when the plaintiff first became a member of IU Credit Union (IUCU), she "received an 'Account Agreement,' the terms of which [were] 'subject to change at any time' as permitted by law." 218 N.E.3d at 1285. "IUCU agreed to notify its members of any changes in the Agreement's terms, either by U.S. mail or (for those who agreed to receive notices electronically) by email." *Id.* "When Land later registered for online banking for one of her checking accounts, she received by email a second agreement (referred to here as the Disclosure) which permitted IUCU to 'modify the terms and conditions applicable to the Services from time to time' and to 'send any notice to [Land] via email.'" *Id.* Pursuant to the Disclosure, Land was "deemed to have received any such notice 'three days after it [was] sent.'" *Id.* "Land's agreement to these terms required her to click 'Accept.'" *Id.*

[24]    Later, "IUCU sent to its customers a proposed modification to the Agreement (referred to here as the Addendum). The terms of this Addendum (1) permitted

---

[7] The court later went on to say,

> Using "any" shows that the agreement did not allow the Bank to add new terms that differed in kind from those included in the original account agreement. Instead, Section 10 allowed the Bank merely to change a specific kind of term by amendment—namely, only those terms existing in the original account agreement. Because the original account agreement had no general dispute-resolution provision or specific arbitration or class-action provisions, the Bank could not add such provisions by amendment. Thus, the addendum was not a valid amendment to the account agreement.

*Decker*, 204 N.E.3d at 922.

either party to require arbitration to resolve disputes without the other party's consent and (2) prohibited members from initiating or joining a class-action lawsuit." *Id*. at 1285-86. "The Addendum also specified, under a heading in bold and in all-capital letters, the member's 'right to opt out' of the arbitration Addendum if he or she so informed IUCU within 30 days of receiving notice." *Id*. at 1286. "To 'opt out' required the member to send IUCU 'written notice' at a specific address. Otherwise, according to its terms, the Addendum became binding on the member." *Id*.

[25] For her online checking account, IUCU sent Land an email with a subject line that "used the same language for monthly accounts statements indicating only that a 'New eStatement' was available 'in Online Banking.' The body of the email itself mentioned nothing about the Addendum." *Id*. "But a link in the email would have directed Land to her five-page monthly account statement, the first page of which referenced the Addendum in bold, all-capital letters and directed her to review the updated terms 'at the end of [the] statement.'" *Id*. Land also received a document via U.S. mail, which "consisted of a two-page monthly account statement, the first page of which likewise noted the Addendum in bold, all-capital letters and directed her to review the updated terms 'included in this mailing.'" *Id*. Land claimed that she did not see either version of the Addendum, "[a]nd she never notified IUCU of her preference to opt out." *Id*.

[26] "Land later filed a class-action complaint against IUCU, alleging wrongful assessment of overdraft fees, breach of contract, breach of duty of good faith

and fair dealing, unjust enrichment, and a violation of Indiana's Deceptive Consumer Sales Act." *Id.* "Citing the Addendum, IUCU moved to compel individual (rather than class) arbitration. After a hearing, the trial court ruled in favor of IUCU, having found 'an enforceable agreement to arbitrate' between the parties." *Id.* On appeal, another panel of this Court reversed, "holding that IUCU failed to provide reasonable notice to Land" by email. *Id.* IUCU sought and was granted transfer.

Land argued that "IUCU's failure to give reasonable notice, along with her silence in response to IUCU's offer, render[ed] the Addendum invalid." *Id.* at 1287. IUCU argued that "it fulfilled its notice obligations by sending the Addendum to Land according to the terms of the Agreement and that Land's silence and inaction amounted to acceptance of the Addendum." *Id.* The court explained that, "insofar as the contracting parties agree on what constitutes effective notice, their agreement controls. But to the extent an agreement fails to define notice, this Court will apply a reasonableness standard as an exercise in contract interpretation." *Id.* The court noted that the Agreement "defined what would constitute notice by email" but did not define "what constitutes 'written notice,' other than saying it is effective once properly mailed"; thus, "whether IUCU complied with the Agreement's terms of notice by mail" was "a question of reasonableness for the courts to decide as a matter of law." *Id.* at 1288.

The court observed that "[t]he email notice contained an inconspicuous subject line (making no indication of a change in terms), and the body of the email itself said nothing of the Addendum." *Id.* "Instead, it informed Land that she

'ha[d] a new eStatement to retrieve,' **not** that she had a 'new notice' to review, as the Agreement required." *Id.* The court went on to say, "But even if the email notice did not qualify as effective notice as defined in the Agreement, the notice sent to her by regular U.S. mail … did constitute reasonable notice" of its offer to amend the Agreement; the mailing consisted of only two pages, "the first of which clearly referenced the Addendum (in bold, all-capital letters), and the second of which was the Addendum itself." *Id.*

[29] That conclusion did not end the court's inquiry, however, because it also had to determine whether Land accepted that offer. IUCU argued that the Addendum gave Land reason to know that her assent could be manifested by silence and that the Agreement and the Disclosure gave her reason to know that continuing to use "her accounts without opting out would constitute acceptance of a change in the Agreement." *Id.* at 1289. Land acknowledged that, in limited circumstances, silence can be used to show that a party accepted an offer, but she insisted that silence "is the exception rather than the rule" and that the circumstances there presented no such exception. *Id.* at 1290.

[30] The court agreed with Land and adopted Section 69 of the Restatement (Second) of Contracts, which "recognizes a party's silence or inaction as acceptance in only three exceptional circumstances":

> (a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.
>
> (b) Where the offeror has stated or given the offeree reason to

understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.

(c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

*Id*. (quoting Restatement (Second) of Contracts § 69(1)).

The court observed that, "[u]nder the Restatement, the 'case for acceptance is strongest' when the offeree's 'reliance is definite and substantial' or when the offeree's 'intent to accept is objectively manifested though not communicated to the offeror.'" *Id*. (quoting Restatement (Second) of Contracts § 69 cmt. c). The court stated, "Even assuming Land was aware of the offer to arbitrate (which she disputes), there's no evidence of her 'definite and substantial' reliance on the proposed arbitration Addendum. In fact, by filing a class-action complaint with the trial court, Land's actions point in the opposite direction." *Id*. (citation omitted).

The court further found "no objective manifestation of intent to accept through Land's continued use of her checking accounts. To begin with, nothing in the Agreement or the Disclosure suggested that silence and continued use of the accounts would result in acceptance of any future modification to those original contracts." *Id*. "Moreover, nothing in IUCU's offer to amend those original contracts (in the form of the proposed arbitration Addendum) conditioned continued use of the accounts on acceptance of the Addendum." *Id*. at 1291.

"To the contrary, a member could 'opt out' of the proposed agreement to arbitrate and continue to use the accounts without being bound by the Addendum." *Id*.

[33] Finally, the court found "nothing in the record to indicate a 'course of dealing' to give IUCU or Land any reason to understand that Land's silence would constitute acceptance." *Id*.[8] IUCU argued that "[b]ecause the Disclosure informed Land that continued use of her accounts was an 'acknowledgment' of her 'intent[t] to be bound' by all agreements she had entered into, … Land knew that continued use of those accounts without opting out of the Addendum would result in acceptance of the agreement to arbitrate." *Id*. The court disagreed, noting that "[w]hen Land registered for online banking, IUCU required her to agree to the terms of the Disclosure by clicking 'Accept.'" Rather than suggesting that Land's silence would amount to acceptance, the parties' previous dealings point in the opposite direction: the need for **affirmative assent.**" *Id*. The court then held that, "while IUCU provided Land with reasonable notice of its offer to amend the Agreement, Land's subsequent

---

[8] At this point, the court dropped a footnote stating, "Because the Court of Appeals' decision in *Neal* [*v. Purdue Federal Credit Union*, 201 N.E.3d 253 (Ind. Ct. App. 2022), *trans. not sought*,] reached the opposite conclusion under a strikingly similar set of circumstances, … we expressly disapprove that case to the extent that it conflicts with our holding today." *Land 1*, 218 N.E.3d at 1291 n.8. In a dissent, Justice Massa agreed with the *Neal* panel's reasoning and expressed concern that his colleagues' "decision could upend long-accepted business practices of companies with large customer bases in Indiana – from Netflix to Citibank and thousands of smaller institutions in between …." *Id*. at 1291-92 (Massa, J., dissenting). Justice Massa noted that IUCU "provided Land an opportunity to opt out, without losing her banking privileges; all she had to do was send written notice within thirty days." *Id*. at 1292 (Massa, J., dissenting) (footnote distinguishing *Decker* omitted). He opined, "The option was neither burdensome nor unreasonable, but the consequences of our decision today may turn out to be both." *Id*. (Massa, J., dissenting).

silence and inaction did not amount to acceptance of the Addendum." *Id*. "Thus, with no enforceable agreement to arbitrate," the court reversed and remanded for further proceedings. *Id*.

[34] IUCU petitioned for rehearing, claiming that the court "failed to address certain legal authorities and arguments raised on appeal and in the transfer proceedings." *Land 2*, 226 N.E.3d at 195. The court granted the petition and rejected IUCU's claims, but left "open the possibility of adopting, in some future case, a different standard governing the offer and acceptance of unilateral contracts between businesses and consumers." *Id*. at 198.

[35] Returning to the instant case, Cripe argues that *Decker* controls because "TCU's change-of-terms provision is in all material respects identical to the change-of-terms provision" in that case. Appellee's Br. at 22. We agree. To be sure, by signing the Membership Application, Cripe agreed to the Terms and Conditions of her account, "as amended from time to time," Appellant's App. Vol. 2 at 125, a provision not found in the Deckers' account agreement. But, as in *Decker*, the Terms and Conditions state that TCU may "change … any term of this agreement[,]" *id*. at 151, which limits TCU to amending "the terms that existed in the original account agreement." *Decker*, 204 N.E.3d at 921. And thus, because "the original agreement contained neither a general dispute-resolution provision nor a specific arbitration or no-class-action provision[,] there was not 'any term' of that Agreement [TCU] could 'change' to effectuate the result it sought here through its" Arbitration Provision. *Id*. To echo Justice Slaughter,

"Words matter." *Id.* Consequently, we affirm the trial court's denial of TCU's motion to compel arbitration and dismiss Cripe's complaint.[9]

[36] Affirmed.

Tavitas, J., and Weissmann, J., concur.

ATTORNEYS FOR APPELLANT

Libby Yin Goodknight
Kay Dee Baird
Alexandra Wilson Pantos
Krieg DeVault LLP
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Lynn A. Toops
Vess A. Miller
Lisa M. La Fornara
Cohen & Malad, LLP
Indianapolis, Indiana

---

[9] Unlike in *Land 1*, we need not determine whether TCU provided Cripe with reasonable notice of the Arbitration Provision or whether Cripe accepted the provision by continuing to use her account. After our supreme court issued *Land 2*, our legislature enacted Indiana Code Chapter 28-1-20.1, entitled "Deposit Account Agreements." Section 6 of that chapter states,

> A deposit account agreement may be changed or amended from time to time, subject to the terms of the deposit account agreement. A depositor's continued maintenance of a deposit account after the effective date of any change or amendment to the deposit account agreement, as described in a written notice provided by the depository financial institution to the depositor, constitutes prima facie evidence of the depositor's intent to accept the change or amendment for which notice was provided.

Ind. Code § 28-1-20.1-6 (eff. July 1, 2024). This statute does not apply here, but it might lead to a different result in future cases with similar facts.